# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| ELCINDA PERSON and ROBERT HOSSFELD, individually and on behalf of others similarly situated, | : : : : | CIVIL ACTION FILE NO. |
| Plaintiffs, | : : | |
| v. | : : | **COMPLAINT – CLASS ACTION** |
| LYFT, INC., and YODEL TECHNOLOGIES, LLC, | : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

**Preliminary Statement**

1.      Plaintiffs Elcinda Person and Robert Hossfeld ("Plaintiffs") bring this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of automated and prerecorded telephone calls, which, Congress found, were rightly regarded as in invasion of privacy.  *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2.      The Plaintiffs allege that Lyft, Inc. ("Lyft") commissioned automated and pre-recorded telemarketing calls to Plaintiffs and other putative class members without their consent.

3.      These calls were made pursuant to an arrangement between Lyft and Yodel Technologies, LLC ("Yodel"), a vendor for Lyft, who telemarketed Lyft's services, and at Lyft's direction.

4.      The Plaintiffs and putative class members never consented to receive these calls. Because automated dialing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, the Plaintiffs bring this action on behalf of a proposed nationwide class of other persons who received illegal robocalls from or on behalf of the Defendants.

5.      A class action is the best means of obtaining redress for the Defendants' wide-scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**Parties**

6.      Plaintiff Elcinda Person resides in this District.

7.      Plaintiff Robert Hossfeld resides in Texas.

8.      Defendant Yodel Technologies, LLC is a Delaware limited liability company with its principal place of business in Palm Harbor, FL and a registered agent of Gabrielle Walthers, 989 Georgia Ave., 1st Floor, Palm Harbor, FL 34683.

9.      Defendant Lyft, Inc. is a Delaware corporation with its principal place of business in San Francisco, CA. Lyft, Inc. operates a ride-sharing marketplace in this District, and has registered an entity Lyft, Inc. (DE) in the state of Georgia.

## Jurisdiction & Venue

10.     The Court has federal question subject matter jurisdiction over these TCPA claims.  *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

11.     The Court has personal jurisdiction over the defendants because they engaged in nationwide telemarketing conduct, including into this District.

12.     Venue is proper under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the automated calls were commissioned into this District.

## TCPA Background

13.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service."  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A).  *See* 47 U.S.C. § 227(b)(3).

3

14.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

15.     The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

16.     While "prior express consent" is required for all automated and prerecorded calls, in 2013, the FCC required "prior express written consent" for all such telemarketing calls to wireless numbers and residential lines.  Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

4

17.     "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12).

18.     When Congress enacted the TCPA in 1991, it found that telemarketers called more than 18 million Americans every day. 105 Stat. 2394 at § 2(3).

19.     By 2003, telemarketers were calling 104 million Americans every day, abetted by the proliferation of new and more powerful autodialing technology. *In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014, ¶¶ 2, 8 (2003).

20.     Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years.

21.     "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

22.     "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket

No. 02-278, at 2 (2016),

https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-

ftc-bureau-consumer-protection-federal-communications-commission-

rulesregulations/160616robocallscomment.pdf.

23.    In fiscal year 2017, the FTC received 4,501,967 complaints about

robocalls, compared with 3,401,614 in 2016. Federal Trade Commission, *FTC*

*Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site*

(Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-

releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

24.    *The New York Times* recently reported on the skyrocketing number of

robocall complaints and widespread outrage about illegal telemarketing. Tara

Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y.

Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-

money/robocalls-riseillegal.html; *see also* Katherine Bindley, *Why Are There So*

*Many Robocalls? Here's What You Can Do About Them*, Wall St. J. (July 4, 2018),

https://www.wsj.com/articles/why-there-are-so-manyrobocalls-heres-what-you-

can-do-about-them-1530610203.

25.    Even more recently, a technology provider combating robocalls

warned that nearly half of all calls to cell phones next year will be fraudulent. Press

Release, First Orion, Nearly 50% of U.S. Mobile Traffic Will Be Scam Calls by

2019 (Sept. 12, 2018), https://www.prnewswire.com/news-releases/nearly-50-of-us-mobile-traffic-will-be-scam-calls-by-2019-300711028.html

## Factual Allegations

26.     Lyft sells technological services to drivers in exchange for usage fees.

27.     Since it was founded in 2012, Lyft's has experienced explosive growth.

28.     Lyft's revenue was over $2.1 billion in 2018, which was double the prior year's revenue.

29.     In order to sell these services to prospective drivers, Lyft relies on telemarketing and engages third parties, such as the co-defendant Yodel, to conduct that telemarketing subject to Lyft's control.

30.     One of the telemarketing strategies used by Defendants involve the use of automated dialers and prerecorded messages to solicit potential drivers to use Lyft's services.

31.     While such automated technology may save time and money for Lyft's telemarketing efforts, it violates the privacy rights of the Plaintiffs and putative class.

Yodel's Calling System for Lyft

32.     Yodel uses a proprietary predictive dialer to make its automated and prerecorded calls for Lyft.

33.     A predictive dialer is an Automatic Telephone Dialing System (ATDS) as that term is defined by the TCPA

34.     The predictive dialer uses an algorithm by which the predictive dialer dials thousands of numbers at a rapid rate, and only transfers the call to a "soundboard" agent once a human being is on the line.

35.     As a result, the called party must wait for the soundboard agent to come on to the line, shifting the burden of wasted time to the call recipients.

36.     Once on the line, the soundboard agent plays several prerecorded messages that telemarket Lyft's services and, after playing those prerecorded messages, transfers the call to a live representative at Lyft.

Calls to The Plaintiffs

37.     Plaintiff Person is a "person" as defined by 47 U.S.C. § 153(39).

38.     Mr. Person's telephone number, (404) 338-XXXX, is registered to a cellular telephone service.

39.     Mr. Person was called by Yodel on behalf of Lyft on several different dates, including:

(i)     March 26, 2019

(ii)    April 8, 2019

(iii)   April 15, 2019

(iv)    April 22, 2019

(v)      April 29, 2019

(vi)     May 7, 2019

(vii)    May 8, 2019

(viii)   May 9, 2019

(ix)     May 24, 2019

(x)      May 28, 2019

(xi)     June 5, 2019

(xii)    June 6, 2019

(xiii)   June 14, 2019

40.    The purpose of the calls was to sell Lyft's software services to Mr. Person in exchange for usage fees.

41.    The calls used a series of different Caller ID numbers, including: (678) 487-5184, (678) 487-5817, (678) 321-9499, (678) 487-5152, (678) 487-5674, (678) 487-5670, (678) 487-5066.

42.    The calls used a series of pre-recorded messages.

43.    On some of the calls, Mr. Person was transferred over to Lyft.

44.    On March 26, 2019, Mr. Person was transferred to "Esther" or "Chloe" at Lyft.

45.    On May 24, 2019, Mr. Person was transferred to "Chloe" at Lyft.

46.     On June 6, 2019, Mr. Person was transferred to "Lakisha" at Lyft.

47.     The calls continued even though Mr. Person's counsel contacted Lyft to advise them that he was being called by Lyft without his consent on May 23, 2019, May 29, 2019 and June 4, 2019.

48.     Plaintiff Hossfeld is a "person" as defined by 47 U.S.C. § 153(39).

49.     Mr. Hossfeld's telephone number, (254) 681-XXXX, is registered to a cellular telephone service.

50.     Mr. Hossfeld was called by Yodel on behalf of Lyft on March 1, 2019 using the Caller ID number (414) 203-8148.

51.     The purpose of the call was to sell Lyft's software services to Mr. Hossfeld in exchange for usage fees.

52.     To identify the calling party, Mr. Hossfeld called back the Caller ID Number on the call and was greeted with pre-recorded prompts and was then transferred to Lyft.

53.     Plaintiffs have not consented to receive Defendants' calls prior to the receipt of these calls.

### Lyft's Liability for Yodel's Conduct

54.     For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing*

10

*the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

55.     In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.  *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

56.     In fact, the Federal Communication Commission has instructed that sellers such as Lyft may not avoid liability by outsourcing telemarketing to third parties, such as Yodel:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

57.     On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be

held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[1]

58.    Lyft is liable for the calls initiated by Yodel.

59.    Lyft hired Yodel to sell its services using telemarketing calls.

60.    Yodel makes the pre-recorded call and then transfers any call recipient still on the line after the pre-recorded messages to Lyft.

61.    From there, Lyft continues the marketing pitch with a live representative.

62.    Lyft knew (or reasonably should have known) that Yodel was violating the TCPA on its behalf and failed to take effective steps within its power to force the telemarketer to cease that conduct.

63.    Any reasonable seller that accepts telemarketing call leads from lead generators would, and indeed must, investigate to ensure that those calls were made in compliance with TCPA rules and regulations.

64.    Lyft has previously received complaints about Yodel's pre-recorded calls yet continues to engage their services.

---

[1]    *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

65.     In fact, Mr. Person, through counsel, has previously contacted Lyft about receiving pre-recorded calls from Yodel, yet Lyft continues to engage their services, and Yodel contacted Mr. Person multiple times after his counsel informed Lyft that he was being called without their permission.

66.     Furthermore, Yodel's calling practices have been challenged in a series of lawsuits, all of which were available to Lyft.

67.     Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information."  *Id.* at 6592-593 (¶ 46).  Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent."  *Id.* at 6593 (¶ 46).

## Class Action Allegations

68.     As authorized by Rule 23(b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

69.     The Class of persons Plaintiffs propose to represent is tentatively defined as:

> All persons within the United States to whom: (a) Defendants and/or a third party acting on their behalf, made one or more non-emergency

telephone calls; (b) to their cellular telephone number; (c) using the same, or similar dialing system used to contact the Plaintiffs, or an artificial or prerecorded voice; and (d) at any time in the period that begins four years before the date of the filing of this Complaint to trial.

70.    Excluded from the Class are counsel, the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

71.    The Class as defined above is identifiable through phone records and phone number databases.

72.    The potential Class members number at least in the thousands. Individual joinder of these persons is impracticable.

73.    The Plaintiffs are members of the Class.

74.    There are questions of law and fact common to Plaintiffs and to the proposed Class, including but not limited to the following:

a.   Whether Defendants violated the TCPA by using automated calls to contact putative class members cellular telephones;

b.   Whether Defendants placed calls without obtaining the recipients' prior express invitation or permission for the call;

c.   Whether the Plaintiffs and the class members are entitled to statutory damages because of Defendants' actions.

75.    The Plaintiffs' claims are typical of the claims of class members.

14

76.     The Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the class, they will fairly and adequately protect the interests of the class, and they are represented by counsel skilled and experienced in class actions, including TCPA class actions.

77.     Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or their agents.

78.     The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

79.     The Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## Legal Claims

## Violation of the TCPA's Automated Call provisions

80.     The Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

81.     Defendants' calls were made without the prior express consent, or the prior express written consent, of the called parties. 47 C.F.R. § 64.1200(a)(2); 47 C.F.R. § 64.1200(f)(8)

82.     The Defendants violated the TCPA by (a) using an automatic telephone dialing system or a prerecorded voice to make calls to cellular telephone numbers without the required consent, or (b) by the fact that others made those calls on its behalf.  *See* 47 U.S.C. § 227(b).

83.     The Defendants' violations were willful and/or knowing.

### Relief Sought

WHEREFORE, for himself and all class members, Plaintiffs request the following relief:

A.      Injunctive relief prohibiting Defendants from calling telephone numbers using an automatic telephone dialing system or a pre-recorded voice, absent an emergency circumstance;

C.      Because of Defendants' violations of the TCPA, Plaintiffs seek for themselves and the other putative Class members $500 in statutory damages per violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3).

D.      An order certifying this action to be a proper class action under Federal Rule of Civil Procedure 23, establishing any appropriate classes the Court

deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

        E.     Such other relief as the Court deems just and proper.

**Plaintiffs request a jury trial as to all claims of the complaint so triable.**

Dated: June 25, 2019        PLAINTIFFS, individually and
on behalf of others similarly situated,

By:

*/s/ Steven H. Koval*
Steven H. Koval
Georgia Bar No. 428905
3575 Piedmont Road
Building 15, Suite 120
Atlanta, GA  30305
Telephone:  (404) 513-6651
Facsimile: (404) 549-4654
shkoval@aol.com

Keith J. Keogh (*pro hac vice* to be filed)
Timothy J. Sostrin (*pro hac vice* to be filed)
Keogh Law, LTD.
55 West Monroe Street, Suite 3390
Chicago, Illinois 60603
Telephone: (312) 726-1092
keith@keoghlaw.com

Anthony I. Paronich (*pro hac vice* to be filed)
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
[o] (617) 485-0018
[f] (508) 318-8100
anthony@paronichlaw.com

17

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 5.1.C & 7.1.D</u>

Pursuant to L.R. 7.1.D, I certify that this document has been prepared with

14-point, Times New Roman font, approved by the Court in L.R. 5.1.C.

*<u>/s/ Steven H. Koval</u>*